May it please the Court, Christopher Young for Defendants. If I may, I'd like to reserve five minutes for rebuttal. Certainly. The District Court made two critical mistakes in denying qualified immunity to the defendants. It's our position that defendants are entitled to qualified immunity under the first prong of Saucier v. Katz. Those two mistakes are that the District Court found that the defendants conceded that the inmate had no opportunity to present his views before classification committees, and also that the Court didn't grant qualified immunity to Defendant Vareta, even though the Court had found that Defendant Vareta was not a critical decision-maker. This confusion that happened where the District Court confused two separate issues, that of Mr. Guizar's gang validation as a border brother member of the Mexican mafia, and that of his transfer to administrative segregation. Upon his transfer to administrative segregation, he was given some notice of the charges in the form of a transfer order, which explained why he was transferred to ADSEG. Also, he had the opportunity to appear before an initial classification committee who reviewed his transfer and found that there was some evidence in the record supporting his transfer to ADSEG. And finally, he received periodic reviews roughly once a month after his initial transfer to administrative segregation, reviewing that order. Can you elaborate on what the record shows went on before the ICC in that initial and periodic review process? I got the impression from the District Court that it was disputed whether or not Guizar had the opportunity really to address the gang issues in those proceedings. Well, the dispute was as to whether he had an opportunity to address the gang validation issue. And that occurred along with the institutional gang investigator who conducted the investigation, sent a validation package to the Sacramento office, and in May of 1998 found that he was actually an associate of the Mexican mafia. So there's the validation issue. But the District Court was confused because the based on evidence that he was involved. That was the initial transfer. Sorry? That was the initial transfer. Yes. And that was in February of 1998. And that was done by the IGI, the investigative part of the process? Yes. So they put him there. And then, as I understand the process, then that's investigated and then there has to be a validation. Is that by the LEIU, I think, is what it is? Well, yes. The validation occurred in conjunction with the investigation because the inmate So then what is your view of the role of the ICC and then what's its part of this process? As I understand the basic premise of this is that the inmate, obviously the prison doesn't want Mexican mafia people out roaming around the prison. Okay? So they have some right to put them in administrative segregation. The correlative is that the inmate has an opportunity to know why he's being put there and to present his side of the case. Now, what's your position as to whom he makes that presentation? Well, my position follows the case of Toussaint, which says that he should have his opportunity to present his views to the classification committee, who's charged with deciding whether or not he was correctly placed in administrative segregation. And so when, in that process, did he get a chance, as far as the record shows, to present his views? Well, the record shows at the excerpts of record, page 48, you'll see that he was given notice and then on page 49 you'll see the committee defendants who gave him the opportunity to present his views roughly three weeks after his initial transfer. After that, he – well, the committee defendants reviewed his segregation roughly once a month until he was found guilty of solicitation to commit battery. He was charged with solicitation to commit murder based on the confidential information in his file. And that information was relied on by the institutional classification committee to maintain him in administrative segregation as a threat to the security of the institution. And the question here also is, did he have a right to appear before the institutional gang investigator? The official charge was deciding whether or not his transfer to administrative segregation was to occur. Now, the institutional gang investigator was Lieutenant Coziart. The record reflects that. Lieutenant Coziart hasn't appeared in this case. He was never served with suit, even though the plaintiff was given about eight months after the initial order of service to effect service. He wasn't able to do that. And so even if there's a – yes, sir. Kennedy. Much like the status of the district court, did district court state its order giving them additional time to present the facts on service? Well, in the district court, they ordered the defendants to file a dispositive motion within 60 days of their initial order. And the defendants requested an additional six months of time to file that, also in order to give the plaintiff additional time. But at the time of the district court's order denying the qualified immunity here, it said that the plaintiff would have to give further information about those 60 days. Correct. And then did it stay that order? Did it – oh, yes. It stayed the order pending this appeal. Okay. So that's the status we have now. Yes. Okay. So can't we just ignore those defendants for the moment? Yes, sir. I agree we can. The plaintiff's briefs just bring up repeatedly that that is the issue. So I thought I would address it. As well as the assistant investigator, who is a defendant in this case, Defendant Vareta, there is absolutely no law to state that he should have been the one to which the inmate had the opportunity to present his views. So – Can I go back to the excerpt at 48 and 49? Exactly what language are you pointing to for – to show that he – that he spoke? Well, yes. He had an opportunity to present his views. Did he present them or just – what did he do? Okay. Well, at the excerpt of the record, page 48, that's the placement order. That's the notice of the charges. Well, all right. Page 49. Quote the language you think is relevant. Well, 49 does not have any language on it. This is –  We asked when did he present his views. You said 48, 49. Well, I mentioned page 49 because that shows that he – All right. But where do you – where did he present his views? March 5th, and that's on – No, no. But where is this in the record? On page 49, it shows that March 5th there was a committee hearing. The notes of that hearing is at the excerpt of record, page 28. But how do we know what he presented, that he did present his views? Where is the record reference that you can read to me right now? I can't, Your Honor, because there's – Oh, well, is it not there? It's not in the record. Oh, it's not in the record. Well, under Toussaint, there's a requirement that an inmate has an opportunity to present his views. And how do we know if he did or didn't? We know if he showed up at the hearing that he had that opportunity. How do we know that? Because on page 28 of the excerpts of record, it shows that the plaintiff was at the committee hearing. The fact that he was there doesn't mean that he had the opportunity. Well, Your Honor, the opportunity to present your views is only necessary in order – I mean, it could be a written – He's got the notice. Yes. We know he got to the hearing. We don't know what opportunity was furnished him. Well, we don't know what he said, other than what he alleged to have said. No, we don't know if he said anything. I'm sorry? We do not know if he said anything. You have no record support for your claim that he presented his views. Well, the record reflects that he had that opportunity, and that's what due process requires. How do we know that? You know how bureaucrats work. They could just say, well, there's nothing to – you have nothing to say. This is the case. They could have just closed him out. Right. I mean, that's the way sometimes bureaucrats act. Yes. You know that. I know that. Well, the prison – you know, the prison has a lot of administrative procedures to go through. If the court would like the prison to also go through a procedure where they have to record everything that is said – Well, that's – all they have to have is one line. We heard from so-and-so. Well, yes. That is on page 49. But on page 28, there's a fuller explanation of their decision and what occurred at that meeting. And also the plaintiff in his declaration states that he appeared at that hearing. Well, nobody's questioning that he appeared. Right. That isn't the issue. Well, the issue is did he have the opportunity. And his appearance at a committee hearing shows that he did have an opportunity. Whether or not he actually presented – had a chance to present evidence or something, this is not the question. The question in Toussaint is any sort of bare ability to present his views. And that happened in this case. Now, the ER-28 says – where does it say he was there? It says the – it says witnesses were not requested. Well, just the very first line. It says Bizarre appeared today. Appeared before the ICC for the initial placement. Exactly. And it shows the – that the committee – it shows the committee's decisions. There are about four lines from the bottom. It states that Guizar states he understands the committee's actions. And in his own declaration, he further goes on to state his version of what – what he asked for at the committee. There's no record to show that the committee is required – or there's no law to show that the committee is required to act in any certain way after an inmate gives their views. If he doesn't agree with the committee's actions – I'm sorry. Where does it say – his declaration says that? Well, if you look at the supplemental excerpts of record, I believe it's at page – his declaration's at page 31. And in paragraphs – well, in paragraph – I'm sorry, Your Honor. I would have to look that up. Why don't you? If I may, I would like to reserve my time. You can do that, Your Honor. Okay. Thank you. I see. I understand there were four different times when the ICC made the decision – a decision to put him into administrative segregation or into the SHU, and they were for different reasons? Oh, yes. That's the evidence that was relied upon. There were four different pieces of evidence that – No. Four different times. One, the initial transfer into administrative segregation. Two, decision to keep him in administrative segregation while his gang validation was pending. Three, a decision to move him to the SHU based on disciplinary violations. Four, a decision to keep him in SHU indefinitely based on his validation as a gang associate. And on all four of those occasions, was he given an opportunity to be heard? Yes, he was, Your Honor, and that's reflected in the record between pages 28 and 42 of the excerpts of record. It shows every classification committee which he appeared at, as well as the actions that were taken. And does it show that he was notified of the charges on each occasion, what they were about? Not at that – at that section, I do not believe. Well, if he wasn't notified of the charges, how would he have an opportunity to be heard on them? Well, in every – well, in the part of the excerpts I just cited, the committee makes clear that he was given notice of the charges before each committee hearing. It's kind of what the committee will begin with. They make sure that the inmate has notice before they even meet, because there's really no reason for them to meet unless he's been given notice of those charges. And so they do reflect in their notes that notice had been given to the inmate. And if it hadn't been given, that committee has an opportunity for the inmate to say, I haven't been given notice of this committee. I don't know what is being decided here. If there are no further questions, I'd like to save the one minute for rebuttal. Thank you. Thank you. Thank you. May it please the Court, my name is Jason Wing. With co-counsel Jason Flagg and under the supervision of Maureen Laughlin, we represent Fernando Guizar, appellee in this case. As an initial issue, Your Honors, we must inform the Court that our supplemental authority cited an unpublished opinion in this Court's 2002 holding in Castro. We apologize for this oversight. This case is not about the quantity of process provided, but rather the failure to provide the required quality of due process. I will address the undisclosed confidential letter allegedly written by Mr. Guizar. Co-counsel Jason Flagg will address the failed notice embodied in the 1030 disclosure forms and the failure to provide a meaningful opportunity to present views before the IGI and the ICC. To the point, Mr. Guizar has spent the last 10 years in a 6-by-9 cell based on a chain of hollow gestures that masquerade as meaningful due process. The law was clearly established at least as early as 1986, and no official in this case could reasonably believe that their actions complied with the requirements laid down by the Supreme Court in Hewitt v. Helms, this Court in DeSantis v. McCarthy, and their progeny. The required notice is not merely notice that there are charges, but notice of the factual basis of the charges. In 1982, in Fiero v. McDougall, this Court held that notice should clarify the issues, identify the evidence relied upon, and provide the prisoner with the chance to marshal the facts and prepare for his defense. More recently, the Supreme Court in this case are you contending that he wasn't, in terms of content, given notice of over the course of these proceedings? Specifically, Your Honor, he was deprived of the letter that was allegedly written by him. California code enumerates what may be classified as confidential, and only two points apply here. One, information if known to the inmate would jeopardize the safety of an individual or information that would jeopardize the security of the institution. There's no conceivable set of facts that would pose a security threat under Title 15, Section 3321, to justify classifying his letter as confidential and depriving it from him. In fact, California code requires that anything that is not confidential must be disclosed to the inmate. The letter simply should not have been classified as confidential. This erroneous classification and deficient notice, it made it impossible for Mr. Guizar to rebut the evidence that was used against him for his validation and ultimately his indeterminate shoe placement. They provided him or they deprived him of meaningful process. This is profoundly important because three pieces of evidence are required to validate an inmate as a gang associate, and as noted by the district court it is undisputed that Mr. Guizar's validation was based on the three letters, one of which was allegedly written by him. Further, Your Honors, the erroneous classification, classified letter allegedly written by Mr. Guizar is the only thing, the only piece of evidence that attributes the subsequent two letters to him. The initial letter carried with it the moniker Coma, which Defendant Verruda said was his gang tag, his gang name, so to speak. That's the only thing that attributes the other two letters to him that they also carry this moniker Coma. But it presupposes that, one, Mr. Guizar wrote the letter, and, two, that it was in fact found in his cell. The evidence is completely based on this. By depriving Mr. Guizar of this letter, it failed, they failed to provide him that meaningful notice, that meaningful opportunity to present his views. Without his knowledge of the letter. Did he deny ever writing the letter? I'm sorry, Your Honor. Did he deny writing a letter? He has denied writing the letter, Your Honor. And he's repeatedly asked for the letter in his complaint over and over again, not only the letter that he allegedly wrote, to have an opportunity to rebuke the letter. He's asked on occasion to compare his handwriting to some kind of proof that he, in fact, wrote this letter. He's also asked a number of times to receive the 1030 disclosure forms, which he did not receive until after his validation. He was validated without any notice of the charges against him, no factual basis for the charges against him. Well, there's a distinction. Was he told the bottom line as to why he was being put in ADSEG? At his initial placement, at his initial placement on he was initially placed on February 11th. But he had his initial placement hearing 20 days later on March 5th. At that hearing, he received the 114 disclosure form, which justified his initial placement. And that certainly provides some notice of his initial placement. But the justification for placing an inmate in administrative segregation pending an investigation permits nearly some evidence. But the investigation, in fact, had ended on March 2nd. Two months later, that evidence was subsequently sent to the LEU, the law enforcement and institutions unit. In Britain, the LEU is the bathroom. I suppose you weren't making that up. The LAIU. No, not intentionally, Your Honor. I'm a little curious then. I thought maybe your colleague was going to address the 114. But the 114, which is the exhibit or ER 48. Yeah, that's correct. It says Guzzar refused to sign it, but that he was given a copy. So he did have that. He has said that he received this, although there's obvious problems with the 114. But he got it. So it is what it is, which is a cliche these days. But the document more or less speaks for itself here. It tells us what he was able to read, and it gives him allegations about why he was put in administrative segregation. That's correct. So he knew that. So then the fact that he didn't have his letter that they're relying on goes to whether he could attack the sufficiency of the evidence to support these allegations. Is that your point? It goes to his validation specifically. The 114 isn't used in the validation process, and it's not used ultimately to determine whether someone is placed in the shoe. The three pieces of evidence, the three of them. You're talking about notice. You said you wanted to talk about notice and the quality, and I'm just trying to understand how it plays out in the real world process here. He knew what he was being charged with, and whatever body he's presenting it to, the concept, as I understand it, he has the opportunity to deal with the evidence that they're relying on. Isn't that your position? At the initial segregation meeting, he had notice of the evidence that they were initially placing him for pending that investigation, but not the evidence with respect to validation. And defendants concede on page 7 of their motion for summary judgment that the IGI and the lieu are the critical decision-makers with respect to validation. The requirement that Mr. Giesar receive this is profoundly important. I'm still trying to understand. I'm sorry. I say it's profoundly. I mean, the adverb doesn't help unless it illuminates, and often, you know, adding expletives to words doesn't help unless there's some content to it. So could you be specific? In the process, he got notice of the kinds of charges, the reasons why he was placed in ADSEC. Now he moves through the process, and you're saying he didn't get the letter that he allegedly wrote, which he denies writing. Okay. So what — where does that come in the process that's important to him? How did it affect him? Right. The lieu validation is based on IGI-classified evidence. And because the ICC is predisposed to classify validated inmates, the meaningful opportunity, the meaningful notice must happen before his validation. The — He got notice. He knew what. Now the question is, how do they prove it? Right. How do they prove it? And he never had notice that the evidence they actually used. It wasn't the 114 they actually used. It was the evidence embodied in the 1030s. Okay. So may I reserve the remainder of my time for co-counsel? Yes. May it please the Court? Once an inmate is — I just want to introduce yourself. My name is Jason Floyd. Thank you, Your Honor. Once an inmate is labeled as a gang associate and placed in the SHU, it's almost zero chance that he's going to get out. And so the consequences of an erroneous validation and placement are enormous. Right. So I think because of the limited time, I think you do understand the need for a process. I'm trying to understand the point at which it broke down that's relevant here. And we now know that he got the 114, so at least he had some notion of why he was placed there. Now what are you addressing? I'm addressing, in particular, the 1030s. Okay. And so you have the 114, which is the placement, as you've correctly identified. And now we're moving to whether he can be validated as a gang associate. So that's different than the 1014. In the 1030s, there's three issues with the 1030s. In particular, I know this is fact-intense, but essentially on May 4th, the IGI sent confidential documents to the LEIU. So what did he need that was in the 1030s? That's where they allege it was confidential. He doesn't know. They're withholding information. The letter. That the decision-maker is going to get to look at or not, but in any event, forms the basis of the recommendation from the IGI upon which they're going to rely. You got it. Okay. So now the letter. Now that's the one thing that's key emerging here. That's exactly right. They classified it as confidential and gave him a 1030 instead of giving him a letter. Okay. And so our issue with the letter is that it shouldn't have been classified. He should have never got a 1030. Is that the only problem, that he didn't see the letter? It's not the only problem. That is a major problem. The other problem is the other 1030s. All of the 1030s contain the same language, and so it's impossible for him to be able to decipher, if three 1030s are here, what the underlying documents are, because they all contain the same language. They're supposed to give enough information about the underlying documents so that the inmate can marshal the facts and prepare a defense for each item. Well, they all contain the same language. Second, it's a disputed fact if he even received the 1030s prior to being validated. I mean, he didn't even receive the 1030s notice before he was validated. It's a disputed fact. And thirdly, the 1030s are supposed to specify why the underlying documents are reliable, and in there it makes a circular argument. The 1030 says specifically that the confidential documents are reliable because they're confidential. There's no reliability shown to our inmate that the underlying documents are really true. And so no reasonable officer would believe that the 1030s given to Mr. Gizar give him sufficient information to marshal the facts and prepare defense for his validation, to the point that Mr. Young had addressed with meaningful opportunity before the IGI and the ICC. I'd like to take just a few minutes on that. Having failed to provide Mr. Gizar with enough information to prepare defense, it's an undisputed fact that Mr. Gizar was then validated and issued an indeterminate SHU term before he had an opportunity to present his views before an IGI, a critical decision maker. The case law is clear. Barnett and Toussaint set forth that he needs a meaningful opportunity before both the ICC and the IGI critical decision makers. So it's clearly established that at the IGI level that the assistant should have been turning materials over to him. That's right. And I'll touch on the view at the end. And what clearly established that? Barnett and Toussaint decided in 1990. And they made it clear that somebody at the investigative stage is part of the decision-making process? Precisely. Okay. Precisely. All right. So the first time they mentioned, they talk about Coziart, the unserved Lieutenant Coziart and his assistant, Vireta. Lieutenant Coziart is the unserved. Is he unserved? Lieutenant Coziart is the unserved. So why are we discussing that here? As you pointed out, when Mr. the defense were up, there's a stay on all proceedings in the lower court. And for judicial efficiency, otherwise we would have to come back and argue the same thing with the same people. And so we recognize and ask the court to decide now on the unserved individuals. But the first time he had an opportunity to speak with Mr. Coziart was 398 days after he had been placed in administrative segregation and 10 months after he had been validated. That's not within a reasonable time, according to Toussaint. All decisions, validation, issued an indeterminate issue term, and he was transferred 15 days later. And so because of that, the IGI, the unit that begins this process, violated Mr. Coziart's clearly established due process rights and are not entitled to qualified immunity. Now, as pointed out, he had plenty of opportunity, plenty of hearings, I should say, before the ICC. Defendants have put forth a myriad of those in the exerts of record. But it's not the quantity at issue. It's the meaningfulness, the quality of what he was able to do. I see my time is up. May I briefly conclude? Yes. Your Honors, the district court ---- I would like to hear, really, and it may take you an extra minute or so, is there anything other than the letters, the letter that he wasn't told that would have allowed him to prepare whatever defense he had? Yes, the letter is the one. And the 1030s, which there's three things that they pegged him on, three documents. And by classifying the letter as confidential, he didn't get that. The other two letters were represented in the 1030s, and the 1030s were conclusory and lacked specificity. They all contained the same language. And this is just with regard to his validation. And so that is what we argue was insufficient information to give him notice. And so we urge this court to affirm the district court's decision, because it correctly held, that the defendants are not entitled to qualified immunity and not entitled to summary judgment. You mentioned something about unserved defendants, that we should reach all of them on the notion that because this has been ---- proceedings have been stayed below, you didn't serve them or they have been served. I didn't quite understand that. They have not been served to my knowledge, Your Honor. So we should nonetheless go ahead and assume they'll be within the lawsuit. That's correct. All right. Thank you. Thank you, Your Honor. Well, we've been discussing whether there's a constitutional violation. But even if there is a constitutional violation, defendants are still entitled to qualified immunity under the second prong, under Saucier v. Katz. There's a reasonable prison official, given the amount of process that the plaintiffs concede that the inmate was given, there's a reasonable official could have believed that the action is comported with constitutional requirements. So on either prong of Saucier, we have a good case for qualified immunity. The plaintiff pointed out that the evidence itself was not sufficient to give him proper notice. However, it's the sum evidence standard is clear as articulated by this Court in Cato v. Russian that sum evidence is any evidence whatsoever in the record. It doesn't have to be the three pieces of evidence required by the California Department of Corrections, which is actually above the sum evidence standard itself. What's your position on the unserved defendants? As to the unserved defendants, it's our position that they're not in this appeal. The only appealing defendants are those that were on the classification committee and the assistant investigator. And as to those defendants, it's clear there was no constitutional violation. Thank you. Thank you. The case to be argued will be submitted. Thank you all very much. Yes, thank you. Both sides. Next case for argument will be. And we appreciate law schools that give their students the opportunity to argue and make some better lawyers when they show up the next time. Did a good job. The United States of America v. Davis.
judges: Reinhardt, Noonan, Fisher